## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

FRANK REYNALDO DÍAZ,

      Plaintiff,

      v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

Civil No. 18-1132 (BJM)

### OPINION AND ORDER

Frank Reynaldo Díaz Soto ("Díaz") seeks review of the Commissioner's finding that he is not disabled and thus not entitled to disability benefits under the Social Security Act (the "Act"). 42 U.S.C. § 423. Díaz contends the Commissioner's decision should be reversed because the administrative law judge ("ALJ")'s residual functional capacity ("RFC") finding and step five non-disability determination were not supported by substantial evidence. Docket Nos. 1, 18. The Commissioner opposed. Docket Nos. 16, 23. This case is before me on consent of the parties. Docket Nos. 5-6. After careful review of the administrative record and the briefs on file, the Commissioner's decision is **affirmed**.

### STANDARD OF REVIEW

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to the fourth step, through which the ALJ assesses the claimant's RFC and determines whether the impairments prevent the

claimant from doing the work he has performed in the past. An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following is a summary of the treatment record, consultative opinions, and self-reported symptoms and limitations as contained in the Social Security transcript.

Díaz was born on June 12, 1967, has an eighth grade education but obtained a GED certificate, does not speak English but speaks Spanish, and worked as a warehouse attendant (fork lift operator, semi-skilled work) from 1990 to 2012. Social Security Transcript ("Tr.") 34, 578-587, 608, 615, 617, 619, 651. On April 8, 2013, Díaz applied for disability insurance benefits,[1] claiming to have been disabled since August 2, 2012 (alleged onset date) at 45 years of age[2] due to high blood pressure, status post-cerebral inflammation resulting in numbness in the whole body,

---

[1] The application is signed April 3, 2013, but SSA documents use an April 8 date as reference. Tr. 135, 615.
[2] Díaz was considered to be a younger individual (Tr. 34), and "[i]f you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work." 20 C.F.R. 404.1563(c).

possibility of an infarct on his left thalamus with abnormal cerebral electricity, visual condition, severe migraine headaches, and severe major depression with suicidal ideation. Tr. 131-135, 570-574, 608, 615, 618. He last met the insured status requirements on December 31, 2017 (date last insured). Tr. 595, 615.

The record contains evidence of diagnosis and treatment for a variety of physical conditions (some found by the ALJ to be severe, others not) and severe mental conditions (anxiety disorder and depression).

**Physical impairments**

### Dr. Tomás Hernández Ortiz (Neurologist)

Dr. Hernández treated Díaz from 1988 to 2013 with medications for epilepsy. The record is extensive, and contains mostly copies of tests performed and prescriptions. The few handwritten notes, however, are illegible. Tr. 622, Exh. 7F at Tr. 1071-1249. Within those that were able to be translated, I note that Dr. Hernández assessed in December 2013 that "[i]n my opinion, Frank is totally and permanently disabled." *Id.* at Tr. 1078.

### Dr. Anselmo Fuentes Aponte

Díaz was treated by Dr. Anselmo Fuentes, family medicine, from 1998 to 2012 for various conditions, including hypertension, myalgia, headaches, sinusitis, abdominal pain, and back pain. Dr. Fuentes assessed in August 4, 2012 that Díaz suffered from severe depression with suicidal ideas, and referred him to the SIF for hospitalization. Notes are scarce and mostly illegible. Exh. 2E at  Tr. 621-622, Exh. 1F at Tr. 788-800.

### Dr. Rafael Ruiz de la Uz (Internal Medicine)

Dr. Ruiz treated Díaz from March 2004 to August 2013. Notes from 2004 to 2012 are handwritten and illegible, except for those of August 2012, that indicate that Díaz was suffering from severe headaches and anxiety. On exam, he showed no musculoskeletal or orthopedic symptoms or pain. Díaz was diagnosed with elevated blood pressure, pure hypercholesterolemia, gastric mucosal hypertrophy, psoriatic arthropathy. The assessment also mentions anxiety, and screening for depression. He was prescribed medications. Notes indicate that Díaz could bathe, dress, eat, and move (get in and out of bed, and walk) without help. In February 2013, Dr. Ruiz also assessed that Díaz suffered from Generalized Anxiety Disorder and Major Depressive Disorder, recurrent episode, moderate. August 2013 notes show that Díaz complained of feeling anxiety.  Dr. Ruiz noted that Díaz showed anxiety, nervousness, severe headaches, and dry skin

with eruptions, lumps and skin rash. The rest of the examination was normal, including his ability to self-care as mentioned in the 2012 notes., Exh. 2E at Tr. 623, Exh. 2F at Tr. 801-834, Exh. 32F at Tr. 1529-1536.

### Dr. Rafael Martín and Dermaesthetics

Díaz was diagnosed with severe psoriasis in May 2013 by Dr. Rafael E. Martín (dermatologist). He was treated with medications at Dermaesthetics in December 2013. Follow-up notes by Dr. Martín from December 2013, and February and June 2014 indicate that Díaz still presented generalized psoriasis. I note that this record contains a lot of copies of the same few documents, and only indicates diagnosis and prescribed medications. Tr. 100-126; Exh. 12F at Tr. 142-143, 1312; Exh. 26F at Tr. 152-154, 1464-1466.

### Dr. Elena Montalbán (Dermatologist)

Dr. Elena Montalbán, dermatologist at Doctors Center Clinic, diagnosed and treated Díaz for psoriasis and seborrheic dermatitis with ointments and injections starting July 2015. Initially, the condition was severe because Díaz did not want systemic treatment, but it improved after two months of treatment. He continued treatment, including Humira injections in December 2015. This condition was ultimately controlled with medications by 2016. However, progress notes from May 2017 show that his cutaneous conditions were exacerbated by stress and were a lifelong condition. Exh. 35F at Tr. 1541-1544; Exh. 40F at Tr. 1557-1559; Exh. 43F at Tr. 200-207, 1577-1584; Exh. 48F at Tr. 273-277, 1655-1659.

In August 2017 (Tr. 56-58), Díaz reported improvement. Tr. 56. According to the progress note contained in the record, Díaz "denies rash or wounds other than the ones to be treated today. Denies itching or jaundice. No rash. No swelling. He denies seeing any lumps in the skin." Díaz also "[d]enies anxiety, depression, changes in humor, nervousness, irritability/mood changes, sleeping difficulty or suicidal thought/attempts." He also has "[n]ot had seizures. No memory problems. Not having difficult [sic] concentrating. Not [sic] walking problems. No headache. Not presents history of fainting. Denies involuntary movements. Denies poor coordination. Not feeling numbness. Denies increase in muscle tone. Not having paralysis." Tr. 57. Dr. Montalbán found no psoriasis lesions, and assessed that Díaz's psoriasis was controlled. Tr. 58.

### Centro de Servicios Médicos de Levitown, Inc.

The record contains evidence from dates between October 2013 to December 2016[3] that Díaz was continuously treated at Centro de Servicios Médicos de Levitown, Inc. for epilepsy, hypertension, psoriasis, polyosteoarthritis, low back pain, lumbago, and shoulder and knee joint pain. Díaz was prescribed medications, and was referred on various occasions to a dermatologist and physiatrist. Exh. 27F at Tr. 1467-1473, Exhs. 44F - 46F at Tr. 208-270, 1585-1652. I note that these exhibits do not generally contain subjective comments, except those mentioned below, that might reveal any assessment about improvement or worsening of the conditions, but it is clear that for the full span of this record, Díaz's conditions remained present, were continuously being monitored and tested, and were being treated.

Notes from May to December 2014 summarized that Díaz had gone for evaluation a year ago for lumbar pain, not traumatic. X-ray results revealed lumbar muscle spasm, discogenic disc disease at L5-S1, and knee marginal spurs. On physical examination in June, Díaz showed lumbar muscle tenderness and limited range of motion. Straight Leg Raise test was negative. Díaz was prescribed medications and physical therapy. Exh. 45F at Tr. 226-234, 1608-1616; Exh. 46F at Tr. 249-250, 264-266, 1631-32, 1646-48.

In January 2015, Díaz reported improvement of his lumbar area after physical therapy but had severe and persistent lumbar pain with lower extremities numbness, as well as in his right shoulder and knees. He showed tenderness in his right shoulder and knees, and limited range of motion in his right shoulder. Díaz was injected with Lidocaine and Kenalog in his right knee, and instructed to rest for three days and apply ice. He was also referred for more physical therapy. Notes show that x-ray results were normal. In February, Díaz was again injected in his left knee for his joint pain. In March, Díaz was injected in his right shoulder for his joint pain with Lidocaine and Kenalog, and instructed to rest for three days. Díaz reported improvement in his knees. A lumbosacral spine MRI performed on June 2015 revealed L4-L5 and L5-S1 degenerative disc disease with moderate facet arthrosis and moderate canal stenosis at L4-L5, and mild to moderate facet arthrosis at L5-S1. An x-ray of the lumbar spine showed discogenic changes at L5-S1, and knee x-rays showed degenerative joint disease at both knees. In July 2015, Díaz reported having chronic lumbar pain but that it was not severe. A Lumbar MRI revealed L4-L5 disc bulge, small partially extruded herniated disc, and L5-S1 disc protrusion. Exh. 46F at Tr. 1623-30, 1641-45, 1650-52.

---

[3] There is one treatment note from October 1996, for nasal congestion. Exh. 27F at Tr. 1474.

In November 2015, Díaz went to the emergency room because while in physical therapy, he was injected and became dizzy and his blood pressure dropped. He was diagnosed with syncope and collapse, intervertebral disc degenerative lumbar, and bilateral primary osteoarthrosis of the knees. He was referred to the Dr. Ramón Ruiz Arnau University Hospital, where he was diagnosed with chronic left basal ganglia lacunar infarcts versus prominent Virchow-Robin spaces, small vessel disease and intracranial atherosclerosis, and chronic bilateral maxillary sinusitis. Exh. 37F at Tr. 169-173, 1546-1550; Exh. 44F at Tr. 1585-1589; Exh. 45F at Tr. 235, 1617; Exh. 46F at 1638-1640.

Notes from February 2016 state that Díaz reported improvement of lumbar pain with physical therapy (seven sessions) and medication (Humira). On October 2016, Díaz reported pain in the lumbar area that radiated to his lower extremities and worsened when sitting. On examination, he was alert, active, and oriented, with active range of motion but pain in his lumbar area and hamstring tightness in his left leg. Treatment plan included physical therapy, sedative massage to lumbar area, and stretching, pelvic, and core exercises. A chest x-ray that month revealed a mild rightward curvature of the mid-thoracic spine and leftward curvature of the lower thoracic spine. Notes from December 2016 state that Díaz underwent twelve physical therapy sessions in the lumbar area, and reported improvement. Chest x-rays showed thoracic scoliosis. On physical examination, Díaz exhibited minimal tenderness to palpation at the lumbar area and adequate range of motion. Exh. 46F at Tr. 1618-21, 1633-37, 1649.

Throughout 2017, Díaz continued prescription treatment for his arthritis, psoriasis and hypertensive heart disease. Each follow-up report include a reported pain score between zero and one. Tr. 44-55.

*Triple-S*

Triple-S health insurance records from June to December 2014 show that Díaz was diagnosed with lumbar spasm and narrowing of L5-S1, and knee pain. Notes from October to December 2016 indicate that Díaz was also diagnosed with lumbago and discogenic disc syndrome. An October 2016 x-ray has findings for mild right curvature of the mid-thoracic spine and leftward curvature of the lower thoracic spine. Exh. 33F at Tr. 163-168, 1537-1539; Exh 41F at Tr. 181-1851560-1562.

Also, a lumbosacral MRI dated June 2015 shows discogenic desiccation and mild space loss at L4-L5, L5-S1. Exh. 34F at Tr. 1540.

## Mental impairments

### Hospital San Juan Capestrano

Díaz was admitted for partial hospitalization for an emotional work-related crisis from August 7 to 16, 2012 for major depression, severe, recurrent. Díaz showed feelings of impotence, anger, frustration, despair, sadness, poor self-esteem, despondency, poor concentration, poor tolerance to frustrations, memory problems, irritability, insomnia, ideas of worthlessness, and occasional thoughts about death. His state affected his family and labor functioning, and altered his sleep and eating patterns. Díaz participated actively in group therapy and showed commitment to his recovery process. With occupational therapy, the therapist check-marked that Díaz increased his periods of attention and concentration, recognized alternatives for better communication, socialized more frequently, developed relaxation techniques, learned and recognized strategies to handle stress, reached tolerance in group activities, and developed skills to handle frustration. Díaz partially identified spare time activities. Díaz was also prescribed medications (Zoloft, Klonopin, and Estazolan). Exh. 3F at Tr. 911-977, Exh. 11F at Tr. 1306-1311.

Díaz was hospitalized a second time from August 20 to 28, 2013 with the same diagnosis and treatment. Group therapy progress notes show that Díaz was oriented and coherent. At first, his concentration and memory were moderate. He could be non-communicative and withdrawn. Overall, he looked sad, worried, or despondent. His participation was sometimes active, sometimes passive. His role was mostly of observer rather than leader or facilitator. He followed instructions. He appropriately socialized, although at first he was selective. His mood varied. Judgment was good, and his mental state was logical, relevant, alert, and coherent. He was to continue outpatient treatment with Dr. Madeline Santos Carlos, his psychiatrist. On both occasions, Díaz exhibited a Global Assessment of Functioning ("GAF") score[4] of 50 at discharge. Exhs. 14F-25F at Tr. 144-151, 1323-1463.

---

[4] "GAF is a scale from 0 to 100 used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults.'" *Hernández v. Comm'r of Soc. Sec.*, 989 F. Supp. 2d 202, 206 f.n. 1 (D.P.R. 2013)(*quoting* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000) (DSM–IV–TR)).

"A GAF score in the 31-40 range 'indicates [s]ome impairment in reality testing or communication … [o]r major impairment in reality testing or communication … [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.'" *López-López v. Colvin*, 138 F. Supp. 3d 96, 100 f.n. 6 (D. Mass. 2015) *quoting* SDM-IV at 32. "A GAF of 41-50 indicates 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifiting) OR moderate difficulty

### State Insurance Fund ("SIF")

Díaz was treated with psychotherapy and medications under the auspices of the SIF from August to December 2012 for a major depression, severe, recurrent, exacerbated by work situations. Physical examinations, including of his extremities, were normal and showed no lumbar/sacral pain. Díaz expressed that changes in his work setting without previous notice caused emotional instability. He could not sleep, and felt despair, impotence, fear, anguish, and no desire to work. He denied homicidal or suicidal ideas. Monthly psychiatric progress notes show that his appearance was unkempt and his mood was depressed, anxious, and irritable. He was cooperative but his affect was labile. He was alert and oriented (in person, place, and time), and his thought process was logical, coherent, and relevant. His memory was intact. His judgment and introspection were adequate, but his impulse control seemed affected. A discharge document included in the record states that it was found that Díaz's mental condition was not caused by a work-related condition and thus Díaz was not covered by Workmen's Compensation. I note that this assessment triggered that Díaz's case be referred as fraudulent because it was provided by Dr. Rafael Míguez, a physician who never examined Díaz and was later charged with fraud against the Social Security Administration, as so argued by Díaz's legal counsel to the Chief ALJ and the Appeals Council.  Tr. 137, Exh. 2E at Tr. 625, Exhs. 13E-14E at Tr. 733-739, Exh. 24E at Tr. 776-787, Exh. 4F at Tr. 978-1055.

### Dr. Madeline Santos Carlo (Psychiatrist)

Dr. Santos treated Díaz from 2005 to 2006, and from 2012 to 2017, with psychotherapy and medications for major depression, severe. Dr. Santos continued treating Díaz after his hospitalization in August 2012 for major depression, severe, recurrent, noting that in addition to his mental symptoms, his physical ailments such as psoriasis, arterial hypertension, convulsive disorder, migraine, muscular spasm at the cervical and lumbar levels, and degenerative disc disease, exacerbated his mental condition. 2013 monthly treatment notes show that Díaz had a high level of anxiety due to economic pressure. His case at the SIF was discharged without disability benefits, and he was waiting for the Social Security initial determination. He also had persistent nightmares, lack of energy and motivation, crying spells and insomnia. Notes indicate

---

in social, occupations, or school functioning (e.g., no friends, unable to keep a job).'" *López-López*, 138 F. Supp 3d at 102 f.n. 7 *quoting* SDM-IV at 34.

that his appearance, hygiene, eye contact, and tone of voice were adequate. He was oriented in time, place, and person. His mood was dysthymic. Judgment, insight, and impulse control were good. On April 2013, Dr. Santos recommended that Díaz not work any type of job. Exh. 2E at Tr. 623-624, Exh. 8F at Tr. 1250-54, 1260-79, 1288-89, Exh. 13F at Tr. 1313-1322.

In August 2013, Díaz presented exacerbation of his emotional symptoms and psoriasis. There is a note that Díaz had just been denied Social Security benefits, and was going to appeal. Dr. Santos reported to the Disability Determination Program that same month that Díaz had an episode of remission from January 2006 to August 2012, at which time he was referred to San Juan Capestrano Hospital and the SIF. Díaz's mental symptoms included lack of energy and motivation, memory impairment, lack of concentration, disturbances in his sleeping pattern, and with crying episodes. He showed increased anxiety levels and decreased psychomotor activity, but was otherwise cooperative, oriented, with intact memory (immediate, recent, and remote), and with good personal hygiene and eye contact. His speech was logical, coherent, and relevant. His judgment and intellectual functions were adequate, and he showed no suicidal or homicidal thoughts. Dr. Santos assessed that Díaz's capacity to care for personal needs, perform household chores, and shop was limited, as was his ability to relate to others (family, friends, strangers). His interest in his usual daily activities (hobbies) decreased. Prognosis was poor. Exh. 8F at Tr. 1250-54.

Treatment continued from 2014 through 2016, with findings and treatment plans as in 2013. Exhs. 28F-31F at Tr. 1475-1528; Exh. 39F at Tr. 178-180, 1554-1556; Exh. 42F at Tr. 186-199, 1563-1576. In November 2016, Dr. Santos recommended that Díaz continue his medications as prescribed, and therapy (psychotherapy, cognitive psychotherapy, and support therapy). "The patient is stable at current dose and/or needs more time to see beneficial effects." Exh. 42F at Tr. 1563.

In 2017, notes indicate that his psoriasis was under control but his depression symptoms continued. January notes indicate that he had insomnia, memory loss, confusion, tiredness, and lack of concentration. His mood was dysthymic and anxious, citing financial pressure, and he had visual hallucinations (he saw someone going by, fleeting shadows). Judgment, insight, and impulse control were good. By May, his visual hallucinations had diminished. Exh. 47F at Tr. 271-272, 1653-1654; Exh. 49F at Tr. 278-286, 1660-1668.

A progress note from July 13, 2017, from a visit while Díaz waited for the ALJ's decision, stated that Díaz was frustrated, anxious, worried, and depressed. He stated that he became very anxious during the hearing. As to his mental state, he was alert and oriented in time, place, and person. His mood was dysthymic and anxious. His affect was congruent, judgment good, insight good, and control of impulses good. He presented no suicidal or homicidal ideas. He did have visual and auditory hallucinations. He was provided with individual, behavioral, and cognitive psychotherapy and prescribed medications. Tr. 15-18.

Progress notes from October 19, 2017, after the ALJ issued de decision to deny benefits, indicate that Díaz experienced an exacerbation of his emotional symptoms. He was downcast, worried, and anxious. As to his mental state, he was alert and oriented in the three spheres. His mood was dysthymic and anxious, his affect congruent. Perception was normal, judgment good, and insight good. He also had good control of impulses. He presented no suicidal or homicidal thoughts. He was provided individual, behavioral, and cognitive psychotherapy, and prescribed medications. Dr. Santos noted that Díaz suffered no losses during the hurricane. Tr. 13-14.

**Procedural History**

On April 8, 2013, Díaz applied for disability insurance benefits,[5] claiming to have been disabled since August 2, 2012 (alleged onset date) at 45 years of age due to high blood pressure, status post-cerebral inflammation resulting in numbness in the whole body, possibility of an infarct on his left thalamus with abnormal cerebral electricity, visual condition, severe migraine headaches, and severe major depression with suicidal ideation. Tr. 131-135, 570-574, 608, 615, 618. He last met the insured status requirements on December 31, 2017 (date last insured). Tr. 595, 615.

Díaz and his wife both prepared a function report, stating that Díaz's daily activities included staying in his room, watching some TV or listening to music, and avoiding others. His wife provided him with food, medications, and care. He would only leave his home when needed, such as for medical appointments. He could not concentrate, was forgetful, and felt disoriented at times. He also had issues understanding and following instructions. Stress caused him a lot of anxiety and he could not handle changes in routine well. He needed to be supervised to dress, bathe, shave, and care for his hair, but did not require assistance to eat or use the toilet. He could

---

[5] The application is signed April 3, 2013, but SSA documents use an April 8 date as reference. Tr. 135, 615.

use the microwave, but could not prepare meals because he would forget to turn off the stove. He left house chores and yard work unfinished because he would forget things and had lost interest in doing tasks. He could not drive because of his medications. He could not manage money. He stated being able to handle authority figures well. Exh. 4E at Tr. 629-647, Exh. 6E at Tr. 667-685.

The case was referred for consultative examinations to assess the effect of Díaz's physical and mental conditions in his functionality.

Dr. Zaida Boria performed a consultative neurological examination on May 30, 2013. His chief complaint was depression. As to general functions, Dr. Boria found Díaz to be alert, relevant, coherent, well oriented (in time, place, and person), and cooperative. He had good recent and past memory.  He showed no aphasia, apraxia, or agnosia. Physically, Díaz had psoriatic lesions over his trunk and extremities, no restrictions in range of motion, and no deviations of the spine. Motor and sensory functions were normal. He had good strength and coordination. Muscle tone was normal, and he showed no tenderness. His gait was normal and was able to stand on his heels and toes. The straight leg raise was negative, and his reflexes were symmetric. Dr. Boria assessed that Díaz could sit, stand, walk, travel, and handle and lift common objects.  Dr. Boria also assessed that Díaz's "main handicap" was his emotional condition of depression. Exh. 5F at Tr. 1056-1064.

Dr. Carlos Maldonado Santos performed a consultative psychiatric evaluation on June 10, 2013. Dr. Maldonado diagnosed major depressive disorder, recurrent, severe without psychotic features, and a guarded prognosis. Dr. Maldonado assigned a GAF of 50. Díaz's capability to handle funds seemed diminished. Exh. 6F at Tr. 1065-1070. On interview, Díaz expressed  feeling pressured at his workplace, and frustrated and unappreciated by his coworkers. Changes at work made him anxious and tense, and he began feeling unmotivated, fearful, depressed, impotent, and lost all interest in social activities and interpersonal interactions. He suffered a panic episode at work in August 2012. Other symptoms include recurrent migraine and psoriatic exacerbations, restlessness, tension, psychomotor agitation, recurrent nightmares, and panic attacks once or twice a week, and more frequent if exposed to crowded places. Díaz also expressed to Dr. Maldonado lacking interest in self-care. He required supervision to bath because he lacked motivation, but could dress and feed himself unassisted. He is unable to drive, use mass transportation, buy groceries, prepare meals because he has forgotten to turn off the stove, pay bills on time, manage finances, self-medicate, and manage household chores. He watched television and listened to music. His tolerance to frustration or tension was poor. *Id.* at Tr. 1066-68.

Dr. Maldonado noted that Díaz's eye contact was poor. His attitude was cooperative and fidgety. His tone of voice was adequate, and his speech pattern and process was spontaneous, logical, relevant, and coherent. His mood was dysthymic and anxious. Díaz presented thoughts of low self-worth. Díaz required repeated clarification and refocusing in order to follow the conversation. He was oriented in place and person, but disoriented in time (the year they were in). His immediate, short term, and recent memory were poor. He could repeat two out of five unrelated words forwards and backwards, recalled zero out of five unrelated words after five minutes, could not recall what he had for breakfast the day prior but could recall his morning routine, and was unable to perform serial threes or spell backwards. His remote memory was good. His judgment and introspection were limited. *Id.* at Tr. 1069-70.

Díaz filed a function report dated September 18, 2013 (Exh. 9E at Tr. 695-710), claiming that his physical and emotional conditions prevented him from working. Physically, Díaz claimed that his conditions affected his ability to stand, double over, reach, kneel, and climb stairs. He could walk five to ten minutes before having to stop and rest for about fifteen to twenty-five minutes.  His intense and continuous headaches, chronic anxiety, and severe depression affected his ability to concentrate, pay attention, and remember. He could not comprehend, follow instructions, or finish assignments. He could deal with authority figures well, but did not get along well with others. The medicines made him sleepy, dizzy and disoriented; and affected his ability to drive, be in high places, and go up and down stairs. Before his conditions, he could drive, work, and do household chores, but now needed help from his wife for his grooming, personal care, food and medication intake, and chores. His depression makes him feel discouraged, irritated, anxious, desperate, uninterested in things, and wanting to be alone. He claimed to be unable to handle money (pay bills, count change, and manage bank accounts). *Id.* at Tr. 703-710.

Dr. Kelly Hortensia, non-examining physician, reviewed the medical record and assessed that Díaz's conditions were not severe, and that he could perform simple tasks. Dr. Clara Castillo-Velez, non-examining psychologist, also assessed that Díaz could perform simple tasks because he could maintain concentration, persistence, and pace for performing such type of work. Exh. 2A at Tr. 296-301.

Specifically, Dr. Castillo assessed that Díaz had mild limitations in activities of daily living and social functioning, and moderate limitations in concentration, persistence, or pace, with no episodes of decompensation. Díaz did not have understanding and memory limitations. As to his

ability to sustain concentration and persistence, he was not significantly limited in his ability to carry out very short simple instructions, perform activities within a schedule, maintain regular attendance, be punctual, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, and make simple work-related decisions. He was moderately limited in his ability to carry out detailed instructions, and maintain attention and concentration for extended periods. As to his ability to adapt, Díaz was not significantly limited in his ability to be aware of normal hazards and take appropriate precautions, or to travel in unfamiliar places or use public transportation. He was moderately limited in his ability to respond appropriately to changes in the work setting, and to set realistic goals or make plans independently of others. *Id.* at Tr. 299-300.

The claim was initially denied on August 7, 2013, with a finding that Díaz could not perform previous work, but could perform simple work, and was therefore not disabled. The notice further stated that benefits were denied because, although he claimed disability due to high blood pressure, numbness in the body, eye conditions, migraine, depression and a possible heart attack, his eyesight was corrected with lenses, and his blood pressure was higher than normal, but there was no evidence of damage to any vital organ, so that did not preclude him from working. Díaz had difficulty performing tasks, but could take care of his personal needs and understand and follow instructions of simple job tasks. Tr. 123, 325.

Díaz requested reconsideration on August 2013, claiming worsening of his existing conditions. The case was referred on reconsideration, and Dr. Ramon Ruiz Alonso and Dr. Jesus Soto adopted in November the initial assessments as written. Dr.  Exh. 4A at Tr. 306, 314-320, Exh. 4B at Tr. 328-329, Exh. 7E at 686-687.

On November 15, 2013, the initial determination of not disabled was affirmed and the claim was denied upon reconsideration. The notice contains a finding that Díaz's conditions limited his ability to perform some work-related duties, that there was not enough vocational information to determine whether he could perform past relevant work, but that the record as a whole showed that he could perform other jobs.  Tr. 126, 330. In December 2013, Díaz filed another disability report claiming that "both my physical and emotional conditions worsen with each passing day." Exh. 10E at Tr. 712.

At Díaz's request (Tr. 333), a hearing before ALJ Livia Morales was held on May 30, 2017. Tr. 59-94.  Díaz and a vocational expert, Mr. Victor Alberigi, testified. Díaz testified that he could

not work because of his medical conditions, specially his emotional symptoms and due to the effect of his medications. He felt pressured at his former job at a warehouse, where he worked for fifteen years, because he felt the employer wanted to replace him and others with new younger hires, causing him to have an emotional crisis and being admitted for partial hospitalization. He hasn't worked since. He couldn't sleep well because he worried about his family and losing his house. He testified that after hospitalization and psychological treatment, he's felt a little better but his emotional condition fluctuated. His medications made him drowsy, and he felt forgetful. His medications for high blood pressure, migraine, seizures, and psoriasis helped control his physical conditions. He no longer suffered from seizures. His psoriasis and migraines were exacerbated by stress. Heat also exacerbated his psoriasis. He had back and knee pain for which he received physical therapy. Tr. 64-83.

The VE testified at Tr. 83-91 that Díaz's past relevant work as a forklift operator was of medium exertion, and semi-skilled work. The ALJ asked whether a person with Díaz's age, education, and past jobs, and the following limitations, could work: never work at unprotected heights or with moving mechanical parts; never operate a motor vehicle; could be exposed to extreme heat occasionally; understand, remember, and perform simple repetitive tasks but not at a production pace; use his judgment and handle changes in the work setting limited to simple, work-related decisions; and off-task time accommodated by normal breaks. The VE testified that such a person could not perform past relevant work because it was semi-skilled, but as per the Dictionary of Occupational Titles (DOT), he could perform work with Specific Vocational Preparation ("SVP") rating of two (unskilled) such as janitor (medium), housekeeping or office cleaner (light), or hand packager (medium).

For the second hypothetical, the ALJ asked if a person with the same limitations as the first hypothetical, with the additional limitations of frequent exposure to moving mechanical parts and frequently operating a vehicle, could work. The VE answered that such a person could do the jobs he mentioned in the first hypothetical.

The ALJ also asked if the person from the first hypothetical, who could occasionally be exposed to moving mechanical parts and occasionally operate a vehicle, could work. The VE testified that his previous answer applied. When asked to add to the occasional limitations question a medium level of exertion, and only frequent climbing of ladders, ropes, and scaffolds, and

Díaz v. Commissioner of Social Security, Civil No. 18-1132 (BJM)                                    16

frequently balance, kneel, crouch, and crawl, the VE testified that such a person could perform the mentioned jobs.

Finally, the ALJ asked if a person with the limitations of the second hypothesis, but at a light exertional level, could work. The VE answered that such a person could perform the housekeeping job, and also inspector and hand packager (light, SVP two), and street cleaner (light, SVP one).

On August 17, 2017, the ALJ found that Díaz was not disabled under sections 216(i) and 223(d) of the Act, from August 2, 2012 to the date of the decision. Tr. 25-43,[6] 1675-1694. The ALJ sequentially found that Díaz:

(1) had not engaged in substantial gainful activity since his alleged onset date of August 2, 2012 through his date last insured (Tr. 27, 1677);

(2) had severe impairments that, in combination, interfered with Díaz's ability to perform basic work activities: anxiety disorder and depression, psoriasis, degenerative disc disease in the lumbar spine, and bilateral knee degenerative joint disease;

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526)[7] (Tr. 28, 1678);

(4) could not perform past relevant work (Tr. 33, 1684) but retained the RFC to perform medium work as defined in 20 CFR 404.1567(c) (lift/carry, push/pull up to fifty pounds occasionally and twenty-five pounds frequently; sit for about six hours, and stand/walk for six out of eight working hours; frequently balance, kneel, crouch, crawl, and climb ladders, ropes, or scaffolds; never work at unprotected heights, around moving mechanical parts, or operate a motor vehicle; have no more than occasional exposure to extreme heat). Díaz was also limited to performing simple, routine, repetitive tasks but not at a production rate pace, and was limited to simple work-related decisions, with the time off-task accommodated by normal breaks (Tr. 30, 1680); and

---

[6] The copy of the ALJ's decision at Tr. 25-35 is missing page 9, supplied at Tr. 1683.

[7] The ALJ considered listing 9.08 for the diabetes mellitus condition, and listing 12.04 for the mental impairment. Tr. 25.

(5) as per his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Díaz could perform (such as janitor, housekeeper, and hand packager). Tr. 34, 1685.

The ALJ, upon determining severe impairments at Step Two, also found that the record showed a history of epilepsy with no seizures, high blood pressure, dizziness, headaches, and peripheral neuropathy, but that the record did not support that these conditions caused more than a minimal limitation in Díaz's ability to perform basic work tasks, and were therefore non-severe. Tr. 27, 1677.

The ALJ considered Listing 1.02 (major dysfunction of a joint), Listing 1.04 (disorders of the spine), and Listings 12.04 and 12.06 for the severity of Díaz's mental impairments. The imaging evidence in the record did not reveal abnormalities, narrowing or bony destruction the meet or equal Listing 1.02. As to Díaz's back, the record contained no evidence of a compromised nerve root or spinal cord. As to Díaz's mental conditions, the ALJ found that Díaz did not meet the "paragraph B" criteria. Listing 12.04B requires: "at least one extreme or two marked limitations in a broad area of functioning which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting or maintaining pace; or adapting or managing themselves. A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis." Tr. 28, 1678. The ALJ reviewed Díaz's self-reported activities of daily living (Exh. 9E) and consultative psychiatric evaluation (Exh. 6F), and found that Díaz had moderate limitations in understanding, remembering, or applying information; mild limitations in interacting with others; moderate limitations concentrating, persisting, or maintaining pace; and mild limitations adapting or managing himself. Tr. 28-30, 1678-1680.

The ALJ further found that Díaz's medically determinable impairments could reasonably be expected to cause the alleged symptoms but not to the intensity, persistence, and limiting effects as claimed. Tr. 31, 1681. As to Díaz's psoriasis, the ALJ found that the record supported the limitations set forth in the RFC determination, including unskilled work that was not at a production rate pace or in tandem with others so as not to trigger stress and to accommodate his mental impairment. Tr. 32, 1682.

The ALJ gave great weight to the consultative neurological opinion of Dr. Boria because it was consistent with the clinical exam that found Díaz to be normal and supported the physical limitations set forth in the RFC finding, but some weight to Dr. Boria's finding that Díaz's main problem was his emotional condition, and no weight to Dr. Boria's "handicap" assessment as that is a conclusion reserved for the Commissioner. *Id.*

The ALJ gave less weight to the State Agency medical consultants' opinions that Díaz's physical impairments were non-severe because the record showed that the impairments caused more than a minimal limitation in Díaz's ability to perform basic work tasks. Tr. 32, 1682-1683.

The ALJ also gave great weight to the State Agency psychological consultants' opinion because they "carefully considered the claimant's statements regarding alleged symptoms and their effects on functioning in making their assessments. They utilized special knowledge in assessing impairments within the SSA disability standard and their opinions are consistent with the record as a whole." The lengthy record of treatment revealed persistent symptoms of depression, with some difficulty in memory and concentration, and brief episodes of fluctuations and exacerbation of his symptoms which were stabilized. The ALJ gave less weight to the consultative psychiatrist's GAF score, because treatment notes revealed moderate limitations as per the State Agency medical consultants' opinions. Tr. 33, 1683-1684.

On August 17, 2017, Díaz was notified of the unfavorable decision. Tr. 19, 1669. Díaz requested review of the ALJ's decision (Tr. 566-568), and submitted through counsel additional evidence (progress notes from Dr. Santos dated July 13 and October 19, 2017)(Tr. 13-14). The Appeals Council denied Díaz's request for review on January 17, 2018, rendering the ALJ's decision the final decision of the Commissioner. Tr. 1. The present complaint followed. Docket No. 1.

## DISCUSSION

This court must determine whether there is substantial evidence to support the ALJ's determination at step five in the sequential evaluation process that based on Díaz's age, education, work experience, and RFC, there was work in the national economy that he could perform, thus rendering him not disabled within the meaning of the Act.

Díaz argues that the case should be remanded because the ALJ's RFC finding is not supported by substantial evidence and therefore the ALJ failed to provide jobs that Díaz could perform. Also, that as a lay person, the ALJ could not interpret raw data throughout the sequential

evaluation process, but proceeded nonetheless to belittle the symptoms of the severe and non-severe impairments, alone and in combination, instead of seeking a medical expert's opinion as to the effect Díaz's conditions in his functional capacity to do work-related activities. And, that the ALJ did not take into account Díaz's language skills and level of education.

The ALJ is required to express a claimant's impairments in terms of work-related functions or mental activities, and a VE's testimony is relevant to the inquiry insofar as the hypothetical questions posed by the ALJ to the VE accurately reflect the claimant's functional work capacity. *Arocho v. Sec'y of Health and Human Services*, 670 F.2d 374, 375 (1st Cir. 1982). In other words, a VE's testimony must be predicated on a supportable RFC assessment. *See* 20 C.F.R. § 404.1520(g)(1). An RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (*citing* 20 C.F.R. §§ 416.927(e)(2), 416.946). But because "a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id.*

Here, the ALJ determined at Steps Two and Three that Díaz's severe impairments were anxiety disorder, depression, psoriasis, degenerative disc disease in the lumbar spine, and bilateral knee degenerative joint disease, none meeting or medically equal the severity of a listed impairment; and his non-severe conditions were epilepsy, high blood pressure, dizziness, headaches, and peripheral neuropathy. With these conditions, the ALJ found that, as per the evidence on record, Díaz retained the RFC to perform medium work as defined in 20 CFR 404.1567(c) (lift/carry, push/pull up to fifty pounds occasionally and twenty-five pounds frequently; sit for about six hours, and stand/walk for six out of eight working hours; frequently balance, kneel, crouch, crawl, and climb ladders, ropes, or scaffolds; never work at unprotected heights, around moving mechanical parts, or operate a motor vehicle; have no more than occasional exposure to extreme heat). Díaz was also limited to performing simple, routine, repetitive tasks but not at a production rate pace, and was limited to simple work-related decisions, with the time off-task accommodated by normal breaks. A review of the hearing transcript shows that this RFC finding was used by the ALJ to pose the hypothetical questions to the VE.

With regards to Díaz's physical limitations, I find that the RFC for medium work with additional limitations was supported by substantial evidence. The record shows that Díaz has a lengthy history of epilepsy, high blood pressure, psoriasis, and lumbar and knee pain controlled by

medications. Díaz testified he no longer suffers from seizures. While Díaz argues that the ALJ should have better assessed the functional limitations that his non-severe conditions provoke in combination, I note that Díaz routinely took his medications for his non-severe and his severe conditions, and that through treatment he was able to control them.

Notes from Centro de Servicios Médicos de Levitown indicate that Díaz underwent twelve physical therapy sessions in the lumbar area, and reported improvement. By December 2016, Díaz exhibited minimal tenderness to palpation at the lumbar area and adequate range of motion. This record also shows that throughout 2017, Díaz continued prescription treatment for his arthritis, psoriasis and hypertensive heart disease. Each follow-up report include a reported pain score between zero and one.

Dr. Montalbán, Díaz's treating dermatologist, assessed in 2017 that Díaz's psoriasis was controlled. That record is enlightening in that, while it is dated at around the same time the ALJ's decision was issued, it portrays a patient that "denies rash or wounds other than the ones to be treated today. Denies itching or Jaundice. No rash. No swelling. He denies seeing any lumps in the skin." Díaz also "[d]enies anxiety, depression, changes in humor, nervousness, irritability/mood changes, sleeping difficulty or suicidal thought/attempts." He also has "[n]ot had seizures. No memory problems. Not having difficult [sic] concentrating. Not [sic] walking problems. No headache. Not presents history of fainting. Denies involuntary movements. Denies poor coordination. Not feeling numbness. Denies increase in muscle tone. Not having paralysis."

Dr. Boria, consultative neurologist, who examined Díaz in 2013, noted Díaz's psoriatic lesions but found his physical examination to be normal (normal gait, normal motor and sensory functions, normal muscle tone, no restrictions in range of motion, and good strength coordination). Dr. Boria  assessed that Díaz could sit, stand, walk, travel, and handle and lift common objects. The ALJ gave great weight to this opinion as it was consistent with the clinical examination according to his specialty. Dr. Boria's assessment regarding depression as a handicap was properly given no weight because the matter of disability is referred to the Commissioner. The ALJ also considered the State Agency medical expert's opinions that Díaz's impairments were non-severe, and gave them less weight because the record showed that they caused more than a minimal limitation in Díaz's ability to perform basic work tasks, as also discussed here.

As to the additional limitations of never working at unprotected heights, around moving mechanical parts, or operating a motor vehicle, I find that the ALJ incorporated into the RFC

Díaz's testimony and information he provided in his function report that his medications made him dizzy or drowsy and that's why he wouldn't drive or cook. And, as to the limitation of having no more than occasional exposure to extreme heat, I find that the ALJ took into account progress notes from Dr. Montalbán and Dr. Santos, and Díaz's testimony, that indicate that the psoriasis was exacerbated by stress and heat and so incorporated that limitation into the RFC finding.

With regards to the mental portion of the ALJ's RFC assessment, there is substantial evidence in the record from different treating and consultative sources, including Díaz's own testimony, that supports a finding that Díaz could perform simple, routine, repetitive tasks but not at a production rate pace; could make simple work-related decisions; and could function within normal breaks.  For a claimant to understand, carry out, and remember simple instructions in any job, he must have the mental ability to remember very short and simple instructions, and the "ability to maintain concentration and attention for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure)."  SSA's Program Operations Manual System ("POMS") DI 25020.010(B)(2)(a).  "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."  20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(C)(3). As defined above, an ALJ's RFC assessment is based on the completion of tasks within the extended periods of the work day, and the ALJ is not required to phrase the RFC finding in terms of hours per day.

Díaz argues that the ALJ improperly considered the opinions of the consultative psychiatric examiner Dr. Maldonado and treating psychiatrist Dr. Santos, and failed to consult with a medical expert to determine his RFC.  Notes from Dr. Santos seem to indicate that his mental symptoms were aggravated from the stress of waiting for the outcome of his Social Security claim, but by 2016, with medications and therapy, "[t]he patient is stable at current dose and/or needs more time to see beneficial effects." Dr. Maldonado did not assess functional limitations but assigned a GAF score of 50, to which the ALJ assigned less weight.[8] On the other hand, the ALJ gave great weight to the opinions of Dr. Castillo and Dr. Soto, who found that Díaz had significant mental limitations,

---

[8] "[T]he GAF rating system . . . is not raw medical data; rather, the system provides a way for a mental health professional to turn raw medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *González-Rodríguez v. Barnhart*, 111 Fed. Appx. 23, 25 (1st Cir. 2004) (per curiam) (unpublished) (*citing Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)).

with mild limitations in daily living and social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. According to these consultants, Díaz did not have understanding and memory limitations, and was not significantly limited in his ability to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, be punctual, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, and make simple work-related decisions. Díaz was not significantly limited in his ability to be aware of normal hazards and take appropriate precautions, or to travel in unfamiliar places or use public transportation.

Other evidence in the record comes from treating source Hospital San Juan Capestrano. Notes indicate that, with treatment, Díaz increased his periods of attention and concentration, recognized alternatives for better communication, socialized more frequently, developed relaxation techniques, learned and recognized strategies to handle stress, reached tolerance in group activities, and developed skills to handle frustration. His judgment was good, and his mental state was logical, relevant, alert, and coherent. Díaz exhibited a Global Assessment of Functioning ("GAF") score of 50 at discharge, going up from 40 upon hospitalization.  A GAF score in the 41-50 range indicates moderate difficulties in social and occupational functioning.[9] *López-López*, 138 F. Supp 3d at 102 f.n. 7 *quoting* SDM-IV at 34.

While Díaz argues that the ALJ should have sought a medical expert to help the ALJ define Díaz's functional limitations, this argument fails because the ALJ did consider medical expert opinions in this case. Regulations provide that the opinions of the non-examining physicians, such

---

[9] The SSA's administrative memorandum AM-13066 advises adjudicators that a GAF score should not be dispositive of impairment severity. GAF scores were discontinued in the current Diagnostic and Statistics Manual of Mental Disorders (5th edition) ("DSM-V"), which was published in 2013, but were still part of the DSM-IV-TR at the time of Díaz's treatment. Because the GAF scores are no longer used in the DSM-V, the SSA directed adjudicators through the AM-13066 to continue receiving and considering GAF scores as they would with other opinion evidence, but that the score must have supporting evidence to be given significant weight. *Valentín-Incle v. Comm'r of Soc. Sec.*, Civ. No. 15-2137 (MEL), 2018 U.S. Dist. LEXIS 215060, 2018 WL 6721340, at *10 n.2 (D.P.R. Dec. 19, 2018) (citations omitted).

I note that the ALJ used the GAF scores in the record, in conjunction with other evidence, as part of the RFC discussion and non-disability findings. The ALJ does not exclusively rely on the GAF scores to assess the severity of Díaz's mental condition, but makes reference to them in determining his functional abilities and limitations.

as the ones that offered their assessments at the initial and reconsideration levels in this case, must be treated as expert opinion evidence.  20 C.F.R. § 404.1527, SSR 96-6p.[10]

 As to Díaz's argument that the ALJ interpreted raw data, such argument is without merit as well. The ALJ is a lay person who is generally unqualified to interpret "raw, technical medical data." *Berrios v. Sec'y of Health & Human Servs*., 796 F.2d 574, 576 (1st Cir. 1986). She may not substitute her "own impression of an individual's health for uncontroverted medical opinion." In other words, an ALJ needs a medical expert to translate medical evidence into functional terms. *Vega-Valentin v. Astrue*, 725 F. Supp. 264, 271 (D.P.R. 2010).  *Carrillo Marin v. Sec'y of Health & Human Servs*., 758 F.2d 14, 16 (1st Cir. 1985). However, an ALJ may render a common-sense judgment regarding an individual's capacities, so long as she "does not overstep the bounds of a lay person's competence and render a medical judgment." *Gordils v. Sec'y of Health & Human Servs*., 921 F.2d 327, 329 (1st Cir. 1990). Here, the ALJ obtained RFC assessments from medical experts and, along with other evidence in the record, made her RFC determination.

Finally, Díaz argues that the jobs suggested by the VE were incompatible with Díaz's language ability (illiterate in English) and education (8th grade) as per the general education development ("GED") classification in the DOT. This argument fails because the jobs suggested by the VE, which require a reasoning level of two, do not contradict the requirements of simple, routine, and repetitive work. *See Muñiz-Hernández v. Astrue*, 2011 WL 2446597, at *10 (D.P.R. June 15, 2011). The ALJ also determined that the VE's testimony was consistent to the information contained in the DOT, pursuant to SSR 00-4p. The Commissioner also argues that because the development requirements are "merely advisory in nature," a claimant may not use the DOT to rebut a VE's testimony. *Warf v. Shalala*, 844 F. Supp. 285, 289 (W.D. Va. 1994). However, it appears that at least one court in our Circuit is not persuaded by the conclusion in *Warf. See Carter v. Barnhart*, No. 05-38-B-W, 2005 U.S. Dist. LEXIS 30501 (D. Me. Nov. 30, 2005).

Ultimately, it is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence (*see Ortiz*, 955 F.2d at 769 (citing *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981); *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir. 1987)). After

---

[10] The SSA recently revised the rules for evaluation of the medical evidence, and the final rules became effective on March 27, 2017 (*see* 82 FR 5844). SSR 96-6p was replaced with SSR 17-2p. SSR 17-2p provides that the State Agency medical consultants or psychological consultants "are highly qualified medical sources who are also experts in the evaluation of medical issues in disability claims under the Act."

thoroughly and carefully reviewing the record, I find that there is substantial evidence to support the ALJ's RFC finding.

As a last matter, in a footnote at pages 3-4 of Díaz's memorandum, Díaz claimed that he suffered damage and prejudice because proceedings before an ALJ were delayed due to the Agency investigating his claim as a fraud case due to Dr. Míguez's assessment contained in the SIF exhibit. The Commissioner argues that a claim raised in a footnote in such a perfunctory manner should be deemed waived.  In my review of the transcript provided to this court, I noted that it contained correspondence from Díaz's legal representation addressed to the Chief ALJ (Tr. 733) and to the Appeals Council (Tr. 776) arguing delay in proceedings because of the fraud investigation. I also note that the SIF record appears in the list of exhibits considered by the ALJ in her decision (*see* Tr. 40, 1691), but that the ALJ makes no reference to that assessment in her findings, nor does the Appeals Council address that argument. In view of the skeletal argument presented by Díaz, I deem this issue waived and will not further address it.  *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

Díaz v. Commissioner of Social Security, Civil No. 18-1132 (BJM)                                    25

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 2nd day of September, 2020.


                                              *s/ Bruce J. McGiverin*
                                              BRUCE J. McGIVERIN
                                              United States Magistrate Judge